IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

TERESA JEWEL TAYLOR,

      Plaintiff,

v.                                        CASE NO. 2:10-cv-0881

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.


M E M O R A N D U M   O P I N I O N

    This is an action seeking review of the decision of the
Commissioner of Social Security denying Claimant's applications for
disabled widow's insurance benefits ("DIB") and supplemental
security income ("SSI"), under Titles II and XVI of the Social
Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have
consented in writing to a decision by the United States Magistrate
Judge.

    Plaintiff, Teresa Jewel Taylor (hereinafter referred to as
"Claimant"), filed applications for disabled widow's insurance
benefits and SSI on May 30, 2006, alleging disability as of March
16, 2002, due to high blood pressure, high cholesterol, herniated
disc in neck, history of ulcers, nervous condition, depression, leg
pain and lower back pain.[1]  (Tr. at 10, 173-77, 179-83, 206-12,

---

[1] Previously, Claimant protectively filed an application
for SSI on April 30, 2002, alleging disability beginning April 1,
2002.  This claim was denied initially August 23, 2002, and upon

229-35, 239-44.)  The claims were denied initially and upon reconsideration.  (Tr. at 10, 97-101, 102-06, 112-14, 115-17.)  On January 10, 2007, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 123-25.)  The hearing was held on June 20, 2007 before the Honorable Theodore Burock.[2] (Tr. at 47-74, 130.)  A supplemental hearing was held on December 7, 2007 before the Honorable Theodore Burock.  (Tr. at 22-46, 152.) By decision dated May 30, 2008, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 10-21.)  The ALJ's decision became the final decision of the Commissioner on May 3, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-4.)  On July 6, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

---

reconsideration on January 17, 2003.  Claimant filed a timely written request for hearing on February 26, 2003, and an unfavorable decision was issued July 18, 2003.  Claimant filed a request for review of the ALJ's decision on September 8, 2003. The Appeals Council found there was no basis for review. Claimant also protectively filed an application for SSI on August 11, 2003, alleging disability beginning April 1, 2002.  The claim was denied initially October 23, 2003, and upon reconsideration February 11, 2004, and an unfavorable decision was issued March 23, 2006.  Claimant filed a request for review of the ALJ's decision on May 30, 2006.  The Appeals Council found there was no basis for review.

[2] Although a vocational expert appeared, she did not testify. (Tr. at 49.)  The ALJ held the record open for the claimant to undergo a consultative examination. (Tr. at 73.) That examination report was received and admitted into evidence. (Tr. at 456-74.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e).

3

By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.  20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).  The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

     In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 13.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of cervical disc disease, depression, anxiety and hypertension.  (Tr. at 13-14.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 14-15.)  The ALJ then found that Claimant has a residual functional capacity for medium work, reduced by nonexertional limitations.

4

(Tr. at 15-19.)  Claimant has no past relevant work.  (Tr. at 19.)
Nevertheless, the ALJ concluded that Claimant could perform jobs
such as small parts assembler and price marker which exist in
significant numbers in the national economy.  (Tr. at 20.)  On this
basis, benefits were denied.  (Tr. at 20-21.)

Scope of Review

The sole issue before this court is whether the final decision
of the Commissioner denying the claim is supported by substantial
evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was
defined as

> "evidence which a reasoning mind would accept
> as   sufficient   to   support   a   particular
> conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting
<u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).
Additionally, the Commissioner, not the court, is charged with
resolving conflicts in the evidence.   <u>Hays v. Sullivan</u>, 907 F.2d
1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not
abdicate their traditional functions; they cannot escape their duty
to scrutinize the record as a whole to determine whether the
conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d
396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the

Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was fifty years old at the time of the administrative hearing. (Tr. at 55.) She has a tenth grade education. (Tr. at 56.) In the past, she worked briefly as a housekeeper for a family member. (Tr. at 56, 312.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it below.

<u>Physical Evidence</u>

Records indicate Claimant was treated by Shahrooz Jamie, M.D. on 127 occasions from April 10, 2002 through November 19, 2007. (Tr. at 346-94, 442-44, 449-52, 475-80, 482.) The handwritten notes are almost completely illegible, save for numerical dates and an occasional decipherable word. <u>Id</u>. Decipherable words are: "arthritis...abdominal pain...hurting in lower neck...herniated disc...acute sinusitis...herpes zoster... anxiety...pulled muscles in lower back...depression...bronchitis...hypertension... hyperlipidemia...arthralgias...menopause syndrome...restless leg syndrome." (Tr. at 346, 349-51, 352-53, 356, 357, 360, 365-369, 384, 388-91, 442-44, 450-51, 475-78, 482.)

On October 23, 2002, Constantino Y. Amores, M.D., Neurological Associates, Inc., provided a consultative examination of Claimant at the request of Dr. Shahrooz Jamie. (Tr. at 273-78.) Dr. Amores

concluded:

>The patient's chief complaint was neck pain.  The neurological examinations shows no neurological deficit. A MRI dated 04/14/02 from KVR was available for review. On a scale of 1-10, (10 being worst) today is characterized as 9.
>
>**Diagnosis**: Cervical Spondylosis (ICD-721.0).
>
>**Co-Morbidities**: 1. Chronic Cervical Strain 2. Depression 3. Hypertension  4.  Gastric Ulcer.
>
>**RECOMMENDATION**: Considering the history, the general and more specifically the neurological examinations and tests available for review, I feel that conservative, non-surgical treatment would be the better option.  This should include initial drastic reduction in activity to minimize aggravating the problem.  If the patient can take anti-inflammatory agents, they have proven to be beneficial.  Sometimes muscle relaxants, a short-term course of stronger pain medications, heat or ice packs can be added to the regimen.  Physical support, such as a brace, provides comfort and hastens improvement in many cases.  As soon as tolerated an active physical therapy program for strengthening exercises could be helpful.  If pain is intractable and overwhelming, a consultation at a multi-disciplinary comprehensive pain program to tap on their expertise on pain medications and pain procedures.
>
>Social-economic concerns and nonorganic medical syndromes must be resolved before any meaningful relief is expected.  A change in lifestyle may be in order to adjust to the physical limitations.

(Tr. at 273.)

On April 14, 2002, Thomas J. Zekan, M.D., Kanawha Valley Radiologists, Inc., reviewed a MRI of Claimant's cervical spine, wherein he concluded: "Routine unenhanced examination was performed...IMPRESSION: Degenerative changes.  Small focal disc herniation on the right at C5-6 with narrowing of the canal somewhat and right neural foramen somewhat.  Clinical correlation

7

is necessary." (Tr. at 454-55.)

On August 9, 2006, Samuel Davis, M.D., radiologist, Montgomery General Hospital, reviewed x-rays of Claimant's cervical spine, per the order of Dr. Shahrooz Jamie. (Tr. at 398, 453.) Dr. Davis concluded:

Complete Cervical Spine:

> Hypertrophic degenerative changes are noted adjacent to narrowed C5-6 intervertebral disc space. The cervical vertebral bodies are intact. The odontoid is intact. The dorsal processes and lateral masses are intact. The curvature and alignment of the cervical spine is normal. C5-6 intervertebral disc space is narrowed. The remaining cervical intervertebral disc spaces are maintained. Degenerative impingement is noted in the C5-6 neural foramina bilaterally. The remaining neural foramina are maintained. Prevertebral soft tissues are normal in appearance. Soft tissue calcifications is noted in the posterior soft tissues of the neck adjacent to the posterior aspect of the C-4 and C-5 dorsal processes.

> IMPRESSION: Arthritic and degenerative changes, as discussed above.

> Follow-up study is suggested, as clinically warranted.

Id.

On August 16, 2006, Abdul M. Mirza, M.D., provided a Disability Determination Examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 330-35.) Dr. Mirza concluded:

> HABIT HISTORY: She smokes one pack of cigarettes a day for 30 years, and she is still smoking. She denied drinking. She says she has never been a heavy drinker...

> PHYSICAL EXAMINATION: GENERAL: The patient is a 50-year-

8

old who looks younger than her age, and very cheerful,
nice lady in no distress.  Her color is good.

VITAL SIGNS: Blood pressure 130/70, weight 139 pounds,
height 64 inches...

NEUROLOGIC: Cranial nerves intact.  Deep tendon reflexes
hyperactive.  Babinski absent.  Muscle strength is good
and equal on both sides.

IMPRESSIONS: The patient is a 50-year-old and has no
skills to do any gainful work.  Since her husband died
four years ago, she has no source of income, and she
cannot do any housework right now for somebody else, as
she did six years ago, because of her pain in the neck,
pain in the back, and pain in the legs.  So right now,
she is destitute.

She has a history of herniated disk in the neck, and no
surgery was recommended.  This happened after she had an
auto accident...She has pain in the back and neck.  She
has a history of hypertension.  She has a history of
peptic ulcer and is under treatment for it.  She has a
history of depression and panic attacks since her
husband died in 2002.

(Tr. at 332-33.)

On September 5, 2006, a State agency medical source completed

a Physical Residual Functional Capacity Assessment and opined that

Claimant could perform medium work with only four postural,

manipulative, visual, communicative, or environmental limitations –

that she could only occasionally climb ladder/rope/scaffolds and

crawl and should avoid concentrated exposure to vibration and

hazards.  (Tr. at 339-40.)  The evaluator, A. Rafael Gomez, M.D.

noted:

Claimant is not fully credible.  She has neck pain and
multiple arthralgias with decrease in ROM's of cervical
spine.  There is no documentation she has a herniated
disc as alleged.  The neurological findings are intact.

9

> Has h/o [history of] HTN [hypertension] under good
> control.  Has diagnosis of gastric ulcer.  The
> neurological findings are intact.  She is reduced to
> medium work.

(Tr. at 341.)

On November 2, 2006, Samuel Davis, M.D., radiologist,
Montgomery General Hospital, reviewed x-rays of Claimant's right
tibia, fibula, and lumbar spine per the request of Dr. Jamie.  (Tr.
at 395-96.)  Dr. Davis' impressions were:

> Right Tibia and Fibula:
>
> The distal femur and patella are intact as visualized.
> The knee joint space is maintained.  The tibia and fibia
> appear intact throughout their extent.  The ankle mortise
> is maintained.
>
> IMPRESSION: Negative right tibia and fibula.

(Tr. at 395.)

> Complete Lumbosacral Spine:
>
> The lumbar vertebral bodies are intact.  The lumbar
> intervertebral disc spaces are maintained.  The curvature
> and alignment of the lumbar spine is normal.  No
> spondylolysis or spondylolisthesis is seen.  The
> sacroiliac joints are intact bilaterally.  Vascular
> calcification is noted.
>
> IMPRESSION: Degenerative changes.  Otherwise, essentially
> negative lumbar spine.

(Tr. at 396.)

On December 9, 2006, a State agency medical source completed
a Physical Residual Functional Capacity Assessment and opined that
Claimant could perform medium work with no postural, manipulative,
visual, or communicative limitations.  (Tr. at 413-17.)  The only

10

limitations were that Claimant should avoid concentrated exposure to extreme cold and vibration due to "pain". (Tr. at 417.) The evaluator, James Egnor, M.D. noted:

> The chart and RFC [residual functional capacity] were reviewed.  The MER [medical evidence of record] is well documented in the abstract above.  PPQ: She notes constant pain in neck, arms, back and leg; takes hydrocodone as needed; no pain clinic or spinal injections.
>
> ADL's: Lives alone, independent with self care, pet care, cooks, cleans, laundry, goes outside daily, drives or rides, shops, handles money, watches TV 6-8 hours daily, talks on phone, visits, church; most activity limited, can walk 1000 feet the [sic] rest one hour.
>
> The complaints are judged to be only partially credible and the RFC is reduced to do only medium work with some environmental limitations.  This reflects the effects of the symptoms on the ADL's and work activity.

(Tr. at 420.)

On March 14, 2007, Claimant had a bone density testing conducted at Montgomery General Hospital per the request of Dr. Jamie. (Tr. at 435, 445-46.)  The bone densitometry report indicated a "medium risk" for osteopenia." Id.

On July 31, 2007, Eli Rubenstein, M.D., reviewed Claimant's cervical spine x-ray and found: "Cervical Spine 2V.  The odontoid process is normal.  There is normal alignment of the cervical spine.  There is slight narrowing of C-5 C-6.  The rest of the interspaces appear normal.  IMPRESSION: Slight narrowing of C-5 C-6." (Tr. at 471.)

On July 31, 2007, Kip Beard, M.D. completed a form titled

11

"Medical Source Statement of Ability to Do Work-Related Activities (Physical)". (Tr. at 464-69.) Dr. Beard opined that Claimant could not lift and carry more than 50 pounds but could lift and carry 21 to 50 pounds occasionally, 11 to 20 pounds frequently, and up to 10 pounds continuously. (Tr. at 464.) Claimant could sit for 4 hours, stand for 2 hours, and walk for 2 hours at one time without interruption; and sit for 6 hours, stand for 6 hours, and walk for 6 hours total in an 8 hour workday. (Tr. at 465.) Claimant could continuously use both hands for handling, fingering and feeling, and occasionally for reaching, and pushing/pulling. (Tr. at 466.) Claimant could frequently use both feet for the operation of foot controls. Id. Regarding postural activities, Claimant could not climb ladders or scaffolds but could occasionally crouch and crawl, frequently climb stairs, stoop and kneel, and continuously balance. (Tr. at 467.) Claimant could occasionally or frequently tolerate all environmental limitations. (Tr. at 468.) Dr. Beard concluded that Claimant could perform all the listed work-related activities. (Tr. at 469.)

On August 5, 2007, Dr. Beard also provided a report of his July 31, 2007 Internal Medicine Examination of Claimant for the West Virginia Disability Determination Service. (Tr. at 458-63.) Dr. Beard concluded:

> IMPRESSION:
> 1.   Chronic cervical strain with bilateral radicular symptoms.
> 2.   Cervical MRI evidence of C5-6 disk herniation with

12

central canal and right foraminal stenosis.
3.    Low back pain.
4.    Hypertension.
5.    Possible chronic bronchitis with chronic tobacco history [1 to 2 packs per day].
6.    History of gastric ulcers with chronic dyspepsia.

SUMMARY:  The following contains information that was applied to the Medical Assessment Form.  In regards to the neck, the claimant has had trouble with her neck since a car wreck in 2000.  There is an MRI on the chart that notes a disk herniation at C5-6 with some degree of central canal and right neuroforaminal stenosis.  X-rays performed today show some mild spondylitic changes and narrowing most pronounced at C5-6.  Examination of the neck revealed complaints of some mild pain with muscular tenderness with some mild range of motion loss.  Reflexes in the upper extremities appeared symmetric.  There was no weakness, atrophy, or sensory loss to suggest cervical radiculopathy, and there were no findings of myelopathy. The claimant's gait appeared normal, and she did not present with or require ambulatory aids.

Regarding the complaint of lower back pain, examination revealed some mild discomfort on motion testing with preserved motion and no evidence of nerve root impingement.   The claimant had some limited shoulder range of motion associated with complaints of neck pain.

Regarding hypertension, I did not appreciate end-organ damage associated with this.

Regarding the issue of stomach ulcers, this is reflected within the medical records.  The claimant has had no known history of bleeding ulcers and has required no surgery or transfusions.  Abdominal examination was unremarkable.

Regarding respiratory function, the claimant does have a chronic smoking history and has symptoms suggestive of chronic bronchitis or perhaps asthmatic bronchitis. Pulmonary spirometry performed today [Tr. at 472-74] was interpreted as normal.

(Tr. at 462-63.)

13

Psychiatric Evidence

On January 14, 2003, Ted Thornton, M.D., Highland Behavior Health, Clay County, provided an intake Comprehensive Psychiatric Evaluation of Claimant upon referral by her representative. (Tr. at 305-07.) Dr. Thornton concluded:

> **PAST PSYCHIATRIC HISTORY**: Has never been hospitalized. Has never been treated except for this Valium, 5 mg, at bedtime by Dr. Jamie...
>
> **MENTAL STATUS EXAM**: The patient presents on time for her interview. She is clean, well-groomed, and appropriately dressed. She relates well, though is tearful and quite depressed during the interview...Denies suicidal or homicidal ideation. Stream of thought, as evidenced by speech, was relevant and coherent without evidence of pathology. Thought content without hallucinations, delusions, illusions, or other pathology.
>
> Intellectual functioning: The patient is awake and alert without change in sensorium during our interview. She is oriented x 4. Memory appears intact, recently and remotely. Immediate recall reveals 3/3 objects recalled immediately, 2/3 after five minutes without clues, and 3/3 after five minutes with clues. General information, calculations, abstractabilities, and similarities done well. Concentration, as measured by the digit test, revealed 5 forward and 3 backward obtained.
>
> **DIAGNOSIS**:
> Axis I:   Major Depression, recurrent, 296.32.
>            Features of Generalized Anxiety Disorder.
>            Features of Panic Disorder.
>    II:    V71.09
>    III.   Hypertension and history of ulcers.
>    IV.    01, 02, 03, and 06
>    V.     Current GAF: about a 50
>
> **PLAN**: Discussed with her in detail possible treatment options. Agreed that she could continue on the Valium if she felt like it was helpful and that was between her and Dr. Jamie. I also told her to continue therapy which she declines at this point. We did agree to begin Lexapro, 10 mg, one each morning to help with mood stability.

...Will see me back in four weeks.

(Tr. at 306-07.)

Records indicate Claimant continued to receive "Pharmacological Management" from Ted Thornton, M.D., at Highland Behavioral Health, Clay County, on thirteen occasions from February 11, 2003 to June 14, 2005.  (Tr. at 279-304.)  On February 11, 2003, Dr. Thornton stated: "Notes doing poorly.  Severe heartburn and nausea [illegible]...Prozac - zombied.  Still c/c [chief complaint] depression but looks better."  (Tr. at 303.)  On March 11, 2003, Dr. Thornton wrote: "Notes doing well with Rx [prescription].  Sleep better. Mood 'pretty good'."  (Tr. at 299.)  On June 3, 2003, Dr. Thornton concluded: "Notes doing better.  Sleep 7 hrs.  Mood [illegible]...better than before."  (Tr. at 301.)  On July 1, 2003, Dr. Thornton stated: "Notes doing fairly well.  Herniated disk in neck bothers sleep."  (Tr. at 297.) On October 7, 2003, Dr. Thornton states: "Notes doing pretty well with med, sleep improved most nights.  Mood improved most days."  (Tr. at 295.)  On October 18, 2003, Dr. Thornton's notes are illegible save for the words "fairly well."  (Tr. at 293.) On December 16, 2003, Dr. Thornton stated: "Notes doing well with Rx.  Mood and sleep improved."  (Tr. at 291.)  On February 17, 2004, Dr. Thornton noted "Doing well with Rx.  Mood good.  Sleep OK."  (Tr. at 289.)  On July 6, 2004, Dr. Thornton wrote: "Notes doing well back on Remeron [illegible]."  (Tr. at 287.)    On October 5, 2004, Dr.

15

Thornton wrote: "Doing OK.  Mood pretty good.  Sleep varies.  Legs all better [illegible]."  (Tr. at 285.)  On January 11, 2005, Dr. Thornton stated:  "Pt [patient] into office c/o [complains of] oversedated and hungover in AM...crying spells and dysphoria [illegible]."  (Tr. at 283.)  On May 22, 2005, Dr. Thornton notes: "Doing well with Rx.  Not a zombie on [illegible]." (Tr. at 281.) The notes dated June 14, 2005 indicate: "Notes doing well.  Sleep and mood better."  (Tr. at 279.)

On August 6, 2006, a State agency medical source completed an Adult Mental Profile of Claimant which included a mental status Examination.  (Tr. at 310-15.)  The evaluator, Lester Sargent, M.A., Licensed Psychologist, found:

> MENTAL STATUS EXAMINATION: The following observations were made during the evaluation:
>
> Appearance: The claimant appeared for the interview casually dressed and with proper hygiene.  She was well groomed and appeared her stated age of 50 years. Attitude/Behavior:  The claimant was cooperative throughout the evaluation.  Eye contact was fair. Speech: Speech was coherent and logically connected. Orientation: She was oriented to time, place, person, and date.  Mood: Observed mood was remarkable for mild sadness and anxiety.  Affect: Affect was mildly restricted.  Thought Processes: Thought processes were understandable and connected.  Thought Content: There was no evidence of delusions, paranoia, obsessive thoughts, or compulsive behaviors.  Perceptual: There was no evidence of unusual perceptual experiences.  Judgment: Judgment was within normal limits, based on responses to Comprehensive subtest questions.  Insight: Insight was fair, based on responses to questions regarding social awareness.  Psychomotor Activity: There was no evidence of psychomotor agitation or retardation, other than mild restlessness.  Suicidal/Homicidal Ideation: The claimant denied suicidal and homicidal ideations.  Immediate

16

<u>Memory</u>: Immediate memory was within normal limits, based on her ability to instantly recall four of four words. <u>Recent Memory</u>: Recent memory was severely deficient, as she was unable to recall any of four words after a 30-minute delay. When given the choice of two wrong answers and the correct answer she identified two of four words. <u>Remote Memory</u>: Remote memory was normal, based on her ability to recall details of her personal history. <u>Concentration</u>: Concentration was mildly deficient, based on Digit Span subtest scaled score of 6. <u>Persistence</u>: Persistence was normal, based on observations made during the evaluation. <u>Pace</u>: The pace was normal, as evidenced during the evaluation.

<u>SOCIAL FUNCTIONING</u>: During the Evaluation: Social functioning during the evaluation was within normal limits, based on clinical observations of social interactions with the examiner and others (i.e. eye contact, sense of humor, and mannerisms).

<u>DIAGNOSES</u>: Based on review of available records and impressions made during the evaluation, the following diagnoses are appropriate.

| | | |
|---|---|---|
| Axis I | 300.00 | Anxiety Disorder, Not Otherwise Specified [NOS](mixed anxiety-depression disorder) |
| Axis II | V71.09 | No diagnosis |
| Axis III | | Neck pain, headaches, lower back pain, bilateral lower extremity pain, hypertension, high cholesterol, and bacterial ulcers (Per claimant) |

<u>RATIONALE</u>: The Axis I diagnosis of Anxiety Disorder, Not Otherwise Specified (mixed anxiety-depression disorder) is based on the claimant's account of recurrent dysphoric mood lasting at least one month associated with difficulty concentrating, remembering things, sleep disturbance, fatigue, irritability, worry, being easily moved to tears, pessimism about the future, and low self-esteem.

<u>SOCIAL FUNCTIONING</u>: <u>Self-Reported</u>: The claimant goes to the store, post office, and runs errands on an as-needed basis. She frequently sees her children and two grandchildren. She walks for exercise. Her hobbies are watching TV and listening to gospel music. She keeps

17

medical appointments.  She eats out whenever she has an appointment.  She reported no close friends.  She does not maintain a checking account.  She receives food stamps and relies upon family members for financial assistance.

<u>DAILY ACTIVITIES</u>: The claimant arises around 8 a.m.  She is able to perform all basic living duties without assistance.  She performs activities of daily living including housework, cooking, laundry, dishes, sweeping, etc.  She is able to work up to 15 minutes at a time before having to take a break due to pain.  She reported her daughter helps out with household chores.  Her daily routine begins by smoking a cigarette, drinking a cup of coffee, and watching TV.  She walks to the mailbox.  She performs household chores throughout the day, watches TV, and eats dinner around 4 p.m.  She walks to her daughter's house in the afternoon.  At night, she watches TV until she falls asleep around 2 a.m.

<u>PROGNOSIS</u>: Fair.

<u>CAPABILITY</u>: The claimant appears capable of managing her funds should an award be made.

(Tr. at 312-13.)

On August 14, 2006, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 316-29.)  The evaluator, Timothy Saar, Ph.D., found Claimant's impairment was not severe regarding her affective disorder, anxiety, NOS.  (Tr. at 316, 321.) He found Claimant had a no limitation regarding restriction of activities of daily living and difficulties in maintaining social functioning; mild degree of limitation regarding difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (Tr. at 326.)  He stated that the evidence does not establish the presence of "C" criteria.  (Tr. at 327.)  Dr. Saar concluded:

18

ADL's [activities of daily living] per ce: able to perform all basic living duties without assistance, including housework, cooking, laundry, dishes, sweeping. Her daughter helps with household chores.  Walks to mailbox.  Watch tv.

ADL's per form: lives alone in doublewide, feeds and waters dogs, no problems with personal care, prepares meals, small loads of laundry, pick up things, drives, shops, can handle money, watch tv, talk to sister on phone.  Problems with memory, concentration, completing tasks, understanding and getting along with others.

ANALYSIS: Clmt [claimant] appears credible.  Clmt can manage basic ADLS and social interactions.  Mild limits in C/P/P [concentration, persistence, pace], but the evidence does not support severe limitations in F.C. [functional capacity] due to mental impairment.

DECISION - IMPAIRMENT NOT SEVERE

(Tr. at 328.)

On December 14, 2006, a State agency medical source completed a Psychiatric Review Technique form.  (Tr. at 421-34.)  The evaluator, Debra Lilly, Ph.D., found Claimant's impairment was not severe regarding her anxiety disorder.  (Tr. at 421, 426.)  She found Claimant had mild limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (Tr. at 431.)  He stated that the evidence does not establish the presence of "C" criteria.  (Tr. at 432.)  Dr. Lilly concluded:

Appeals - alleges increase in mental health symptoms...treating source notes make no mention of this. Claimant alleges variety of symptoms and limitations. The evidence does not support that she makes these to her treating source or that she has functional limitations

19

that are consistent with these deficits.  She is not considered credible with regard to the severity of her mental health symptoms.

(Tr. at 433.)

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to properly weigh the opinions of Claimant's treating physicians which demonstrated she was disabled under Listing of Impairments, §1.04(A), and erred in concluding her credibility was not fully credible, and (2) the ALJ ignored the opinions of Claimant's treating psychiatrist.  (Pl.'s Br. at 7-14.)

The Commissioner responds that substantial evidence supports (1) the ALJ's treatment of the medical records of Claimant's treating physicians and Claimant's credibility and (2) the ALJ's treatment of the medical records of Claimant's psychiatrist. (Def.'s Br. at 11-20.)

Listing of Impairments, Medical Source Opinions, Credibility

Claimant first argues that the ALJ failed to properly weigh the opinions of her treating physicians, Thomas J. Zekan, M.D. and Shahrooz Jamie, M.D.[3], which demonstrated she was disabled under Listing of Impairments, §1.04(A), and erred in concluding that she

---

[3] Claimant and the Commissioner refer to Claimant's physician incorrectly as "Dr. Sharooz, M.D." in their briefs. (Pl.'s Br. at 4; Def.'s Br. at 11.)  The ALJ referred to him as "Dr. Sharooz Jamie." (Tr. at 13.)  His correct name is "Shahrooz Saheb Jamie, M.D." (Tr. at 441.)

was not fully credible.   (Pl.'s Br. at 7-12.)   Specifically,
Claimant asserts:

> It is clear, based on objective MRI and X-Ray evidence,
> that Ms. Taylor is disabled under Listing of Impairments,
> §1.04(A)...  Despite meeting and/or equaling, this
> listing, the ALJ committed reversible error by failing to
> properly evaluate the medical evidence and the opinions
> of her treating physicians...

> The radiological evidence in this case fits squarely into
> the framework of Listing 1.04(A).  On April 4, 2002, an
> MRI examination of the plaintiff's cervical spine that
> was performed by Dr. Thomas J. Zekan, M.D. (R. 412)....

> Further, there is clinical documentation from the
> plaintiff's treating physician, Dr. Sharooz, M.D., that
> Ms. Taylor suffers from chronic radiculopathy and
> neurological pain in her neck which radiated into both
> her shoulders, her left arm, left hand and back.  In
> fact, she was treated for a myriad of neurological
> symptoms caused by the referenced cervical herniation on
> thirty-two (32) visits to Dr. Sharooz's office between
> April 10, 2002 and March 14, 2007.  (R. 346-412.)...

> At the hearing, the Plaintiff testified entirely
> consistently with the objective radiological evidence and
> the clinical findings of her doctors...

> Despite the fact that the plaintiff's testimony was
> completely consistent with the clinical findings in this
> case, the ALJ found that the "claimant's statement
> concerning the intensity, persistence and limiting
> effects of these symptoms are not fully credible" and
> that the "degree of treatment as described in this
> decision does not provide a basis" for the complaints of
> pain that the claimant made at the hearing.  Given the
> record, as provided herein, it is an inescapable
> conclusion that the ALJ entirely ignored the objective
> MRI findings, her treating physician's observations and
> her own testimony regarding her diagnosis, pain and
> subsequent treatment received by the plaintiff.

> The ALJ also failed to recognize that a treating
> physician's opinion is entitled to controlling weight
> where it is well supported by medically accepted clinical
> and laboratory diagnostic techniques and not inconsistent

with the other substantial evidence in the case record.

(Pl.'s Br. at 7-11.)

The Commissioner responds that substantial evidence supports the ALJ's treatment of the medical records of Claimant's treating physicians, Dr. Zekan and Dr. Shahrooz Jamie.  (Def.'s Br. at 11-17.)  Specifically, the Commissioner argues:

> First, Plaintiff wrongly asserts that Dr. Zekan and Dr. Sharooz provided medical opinions that the ALJ was capable of weighing.  To the contrary, neither Dr. Zekan nor Dr. Sharooz offered any assessment of Plaintiff's limitations that would necessitate that the ALJ accord weight to their medical statements.  Nevertheless, the ALJ's decision reflects that he both discussed and adopted the diagnostic findings of these two physicians (Tr. at 13-14)...
>
> Second, and as the ALJ noted, the objective evidence of record did not support a finding of disability (Tr. at 8)...Interesting, Plaintiff argues that her treating physician opinions should be given controlling weight without identifying any opinion evidence that the treating physicians' offered (Pl.'s Br. at 7-11)...
>
> Third, as the ALJ properly concluded, Plaintiff's conservative treatment and success with medication, is not consistent with the treatment of someone suffering from a disabling impairment (Tr. 19)...
>
> Fourth...the ALJ also correctly noted that Dr. Sharooz did not provide any clinical or objective findings to support his opinion (Tr. 52-53).  To the contrary, Dr. Sharooz's treatment notes generally reflected that Plaintiff was "doing well" (Tr. 285-299)...
>
> Fifth, contrary to Plaintiff's claims, her activities of daily living do not support a disability finding...
>
> Sixth, Plaintiff erroneously asserts, as part of her treating physician argument, that Plaintiff met or equaled a Listing (Pl.'s Br. at 7-8).  The Listings describe impairments considered severe enough to prevent a person from engaging in any gainful activity...Meeting

or equaling the Listings cannot be based simply on a
claimant's testimony or speculation...

Seventh, the ALJ properly relied upon the opinions of the
state agency physicians, Drs. Gomez and Egnor.   The
opinions rendered by state agency physicians on an
individual's residual functional capacity are entitled
to weight because state agency medical consultants are
"highly qualified" physicians and "experts in the
evaluation of the medical issues in disability claims
under the Act."   See 20 C.F.R. §§ 404.1527(f),
416.927(f); Social Security Ruling (SSR) 96-6p.

(Def.'s Br. at 11-16.)

"The Listing of Impairments describes, for each of the major
body systems, impairments that are considered severe enough to
prevent an adult from doing any gainful activity," see 20 C.F.R. §§
404.1525(a) and 416.925(a) (2010), regardless of age, education or
work experience, see Sullivan v. Zebley, 493 U.S. 521, 532 (1990).
"For a claimant to qualify for benefits by showing that his
unlisted impairment, or combination of impairments, is 'equivalent'
to a listed impairment, he must present medical findings equal in
severity to all the criteria for the one most similar listed
impairment."  See id. at 531.

In an extensive twelve-page decision, the ALJ considered the
entire record and made these findings regarding Claimant's
impairments, including Claimant's mental status:

The claimant's cervical disc disease is evaluated under
Section 1.04 (musculoskeletal system) of the listings.
However, there is no evidence resulting in compromise of
a nerve root or the spinal cord.  There is no evidence of
limitation of the spine, motor loss accompanied by
sensory or reflex loss, and if there is involvement of
the lower back, positive straight-leg raising test

23

(sitting and supine).

The claimant's hypertension is evaluated under Section 4.00 of the listings.  However, there is no evidence of any effects on other body systems (heart, brain, kidneys, or eyes) when considered effects under the listings.

The claimant's mental impairments do not meet or medically equal the criteria of listings 12.06 and 12.09. In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

In activities of daily living, the claimant had mild restriction.  She walks for exercise. She was able to perform all the basic living duties without assistance. She did the housework, cooking, laundry, dishes, sweeping, etc.  She takes car of her dogs.

In social functioning, the claimant has mild difficulties.  She frequently sees her children and grandchildren.  She goes to the store, post office, and runs errands on an as needed basis.  She eats out when she has a doctor's appointment.  She talks to her sister on the telephone.  She goes to church one or two times a month (Exhibit 3E).

With regard to concentration, persistence or pace, the claimant has moderate difficulties.  She watches television and listens to gospel music.  She reported that she could take care of paying bills and handling her checkbook (Exhibit 3E).

As for episodes of decompensation, the claimant has experienced no episodes of decompensation.

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked"

24

limitation and "repeated" episodes of decompensation, the
"paragraph B" criteria are not satisfied.    The
undersigned has also considered whether the "paragraph C"
criteria are satisfied.  In this case, the evidence fails
to establish the presence of the "paragraph C" criteria.

(Tr. at 14-15.)

In evaluating the opinions of treating sources, the
Commissioner generally must give more weight to the opinion of a
treating physician because the physician is often most able to
provide "a detailed, longitudinal picture" of a claimant's alleged
disability.   See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)
(2010).  Nevertheless, a treating physician's opinion is afforded
"controlling weight only if two conditions are met: (1) that it is
supported by clinical and laboratory diagnostic techniques and (2)
that it is not inconsistent with other substantial evidence." Ward
v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R.
§§ 404.1527(d)(2) and 416.927(d)(2) (2010).

The opinion of a treating physician must be weighed against
the record as a whole when determining eligibility for benefits.
20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2) (2010).  Ultimately,
it is the responsibility of the Commissioner, not the court to
review the case, make findings of fact, and resolve conflicts of
evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).
As noted above, however, the court must not abdicate its duty to
scrutinize the record as a whole to determine whether the
Commissioner's conclusions are rational. Oppenheim v. Finch, 495

25

F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2), 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(i) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the

factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record." Martin v. Secretary of Health, Education and Welfare, 492 F.2d 905, 908 (4th Cir. 1974); Hayes v. Gardener, 376 F.2d 517, 520-21 (4th Cir. 1967). Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record." Smith v. Schweiker, 795 F.2d 343, 346 (4th Cir. 1986).

Regarding the medical evidence, particularly the reports of Dr. Shahrooz Jamie and the MRI report of Dr. Zekan, the ALJ made these findings:

> On October 20, 2002, the claimant was seen by Dr. Constantine Amores for a neurological examination and diagnosed with cervical spondylosis. Dr. Amores noted that she also had chronic cervical strain (Exhibit 1F)...
>
> The evidence contains medical records covering the period April 10, 2002, through November 2, 2006, from Dr. Sharooz Jamie, the claimant's treating physician. An MRI of the cervical spine dated April 14, 2002 [Thomas J. Zekan, M.D.], showed degenerative changes; small focal disc herniation on the right at C5-6 with narrowing of the canal and right neural foramen (Exhibit 9F/67). An

27

x-ray dated August 9, 2006, showed hypertrophic degenerative changes adjacent to narrowed C5-6 intervertebral disc space. Degenerative impingement was noted in the C5-6 neural foramina bilaterally (Exhibit 9F/53).

Subsequent to the hearing, the claimant underwent a consultative internal medicine examination on July 31, 2007, by Kip Beard, M.D. The claimant reported she had a herniated disc and was treated with osteopathic manipulation and medications. Dr. Beard diagnosed the claimant with chronic cervical strain with bilateral radicular symptoms; cervical MRI evidence of C5-6 disc herniation with central canal and right foraminal stenosis; low back pain; hypertension; possible chronic bronchitis with chronic tobacco use history; and history of gastric ulcers with chronic dyspepsia (Exhibit 21F)...

The evidence contains medical records from Dr. Sharooz Jamie, the claimant's treating physician. The claimant was diagnosed with peptic ulcer disease, abdominal pain, restless leg syndrome, and menopausal syndrome. The claimant received conservative treatment and prescribed Zantac for peptic ulcer disease and Klonopin for her restless leg syndrome. There was no other treatment prescribed and therefore, the undersigned finds that these are non-severe.

(Tr. at 13-14.)

The undersigned has thoroughly reviewed all the medical records, and finds that the ALJ fully and correctly considered Dr. Shahrooz Jamie and Dr. Zekan's opinions, as well as those of the consultative examining physicians and the state agency record-reviewing medical sources of record in keeping with the applicable regulations. The ALJ's decision reflects that he both discussed and adopted the diagnostic findings of these two physicians. It is important to note that Dr. Zekan provided only one single page report of MRI findings on April 14, 2002. (Tr. at 412.) Dr.

28

Shahrooz Jamie's mostly illegible reports show conservative treatment and medication management. Neither Dr. Zekan nor Dr. Shahrooz Jamie offered an opinion regarding the extent of Claimant's limitations or disability. Additionally, a cervical spine x-ray dated August 9, 2006, ordered by Dr. Shahrooz Jamie and read by Samuel Davis, M.D., did not show a herniation but rather "arthritic and degenerative changes." (Tr. at 398.) Further, the ALJ clearly and thoroughly described why Claimant had not met or equaled a Listing.

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

    - The medical signs and laboratory findings;

    - Diagnosis, prognosis, and other medical opinions provided

by treating or examining physicians or psychologists and
other medical sources; and

- Statements and reports from the individual and from
treating or examining physicians or psychologists and
other persons about the individual's medical history,
treatment and response, prior work record and efforts to
work, daily activities, and other information concerning
the individual's symptoms and how the symptoms affect the
individual's ability to work.

The ALJ wrote a very thorough evaluation of Claimant's
impairments and the medical evidence of record, including
Claimant's daily activities. (Tr. at 13-19.) The ALJ made these
specific findings regarding Claimant's credibility:

> The claimant testified at the first hearing she worked
> for her sister doing housework to help pay her bills.
> She cannot lift anything heavy. She had to cut her hair
> because it was too heavy. If she uses her arms, it
> caused pain. It was a burning and dull ache into the
> back of her head. Her headaches occurred twice a week,
> lasting two to three hours unless she takes Tylenol. She
> was prescribed Prevacid and Zantac to flush the bacteria
> out of her system. She can walk 200 yards until her
> right leg starts to hurt. She can stand for 15 minutes
> before she has to sit down. Her daughter mops and
> vacuums. Her daughter lives only 200 feet away from her.
> Her daughter helps her with chores, paying the bills, and
> buys her cigarettes. She sits on the porch a lot; that
> is how she got her tan. She goes to church once in a
> while. She has three grandchildren and she is not able
> to babysit. She goes to the grocery store. She watches
> television and does not read the paper. She can walk a
> football field. She has panic attacks, feels like a
> heart attack. Her blood pressure pills make her sleepy.
> She has crying spells and she cried off and on for half
> of the day. She uses a rice bag and Tylenol to ease her

neck pain.

The claimant testified at the second hearing that the only thing different was that her doctor had doubled her blood pressure medicine. The undersigned noted she mentioned emotional problems at the prior hearing and the claimant was crying. She has crying spells two times a day and lasts three to four hours. She feels like she is a burden to everyone. She does not think that Xanax was helping her. She is seeking Dr. Thornton for her panic attacks and depression. She has panic attacks twice a month. She does not like being around people...She takes Hydrocodone twice a day and helps for about two hours. She lies down a lot...She smokes cigarettes daily...She stopped seeing Dr. Thornton because she lost her medical card. She was off her medications for four to six months. Dr. Jamie prescribed her Valium and Xanax. She was having trouble sleeping and was prescribed Klonopin. Dr. Jamie diagnosed her with restless leg syndrome. She gets about six hours of sleep a night...She gets tired from her blood pressure medicine and has hot flashes. She loses sleep because of her conditions. She has flare ups of her stomach problems if she eats spicy or greasy foods or raw vegetables. Her stomach pain feels like glass in her stomach and cars doing wheelies.

The undersigned finds that the claimant's allegations/ symptoms are not supported by objective findings. During the examination by Dr. Beard, the claimant reported that she applied heat and ice to her neck and back "every once in a while", and takes over-the-counter Tylenol that helped a little bit with her pain. Examination of the claimant's cervical spine revealed complaints of mild pain with muscular tenderness. Examination of the shoulders revealed complaints of neck pain with normal range of motion of the bilateral shoulders. Examination of the hands revealed no tenderness, redness, warmth or swelling and range of motion was normal. Evaluation of the range of motion of the knees was normal. She had mild discomfort with range of motion testing of the lumbosacral spine and muscular tenderness. She was able to stand on one leg alone. She had negative straight leg raising test. She had normal range of motion of the hips. She was able to heel-walk, toe-walk, tandem walk, and squat. X-rays revealed mild spondylitic changes and narrowing most pronounced at C5-6. There was no weakness, atrophy, or sensory loss to suggest cervical radiculopathy and there were no findings of myelopathy.

31

Examination of her lower back revealed some mild discomfort on motion testing with preserved motion and no evidence of nerve root impingement. Regarding hypertension, Dr. Beard did not appreciate end-organ damage associated with this. Regarding her stomach ulcers, this was reflected within the medical records. She has had no known history of bleeding ulcers and had not required surgery or transfusions. Regarding the claimant's respiratory function, she had a chronic smoking history and symptoms suggestive of chronic bronchitis. Pulmonary spirometry dated July 31, 2007, was normal (Exhibit 21F)...

During examination by Dr. Mirza the claimant reported that she took Xanax for her depression and her nervous problems. She reported that she took it "once in a while." At times she takes Xanax for a week or so, and then she stops (Exhibit 6F/2).

A cervical spine x-ray dated August 9, 2006, showed the cervical vertebral bodies were intact. The dorsal processes and lateral masses were intact; curvature and alignment was normal; and the remaining cervical intervertebral disc spaces were maintained (Exhibit 9F/53).

When the claimant saw Dr. Constantino Amores, he reviewed the claimant's neurological examinations and tests and felt that conservative, non-surgical treatment would be the best option...(Exhibit 1F).

When the claimant was examined by Dr. Ted Thornton on June 14, 2005, he noted that she was doing well and her mood was better. She had improved on her medication. The claimant's global assessment of functioning score was 50 (Exhibit 2F/1). Dr. Thornton noted on February 17, 2004, that she was doing well with her medications (Exhibit 2F/11). Dr. Thornton noted that the claimant interacted well; had direct eye contact; her mood was euthymic; and her stream of thought was normal. On June 3, 2003, Dr. Thornton noted that the claimant was doing better; sleeping seven hours; and her mood was better (Exhibit 2F/23).

During examination by Mr. Sargent, the claimant's affect was mildly restricted. The claimant's mood was remarkable for mild sadness and anxiety. Her thought processes were understandable and connected. Her

32

judgment was within normal limits and her insight was fair. There was no evidence of psychomotor agitation or retardation, other than mild restlessness. Her immediate memory and remote memory were within normal limits. Her persistence and pace were within normal limits. Her social functioning during the evaluation was within normal limits (Exhibit 4F).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible. While the claimant testified to significant physical symptoms and limitations, the objective findings and degree of treatment as described in this decision do not provide a basis for such complaint. The state agency physicians and a consultative examiner have evaluated the claimant, supporting a significantly greater capacity for physical activity that alleged by the claimant.

The claimant's lack of credibility as to her physical complaints raises a significant question as to her allegations of significant psychological symptoms and limitations. In addition, the treatment notes of Dr. Thornton do not support the claimant's testimony. While Dr. Thornton assessed the claimant with a GAF of 50, the balance of her treatment records indicate that the claimant was functioning at a higher level.

With regard to side effects of medications, the undersigned finds that the claimant suffers from no side effects from any medications which would interfere with performing the jobs identified by the vocational expert.

With regard to activities of daily living, the claimant minimized her level of activity. The undersigned notes in the medical records that there is no basis for such restricted activities of daily living.

As to the effectiveness of treatment, the claimant has received treatment for the allegedly disabling impairments, but the treatment has been essentially routine and/or conservative in nature. Further, it the claimant were suffering to the extent alleged it would be expected that intensification of treatment would occur. However, the claimant has continued on with conservative

treatment.

As for the opinion evidence, on August 14, 2006, Timothy
Saar, Ph.D., a state agency medical consultant, completed
a Psychiatric Review Technique form and opined that the
claimant did not have a severe impairment (Exhibit 5F).
The undersigned gives some weight to this opinion; but,
gives the benefit of doubt to the claimant and finds her
mental impairment is severe.

(Tr. at 16-19.)

In his decision, the ALJ determined that Claimant had
medically determinable impairments that could cause her alleged
symptoms. (Tr. at 18.) The ALJ's decision contains a thorough
consideration of Claimant's daily activities, the location,
duration, frequency, and intensity of Claimant's pain and other
symptoms, precipitating and aggravating factors, Claimant's
medications, and treatment other than medication. (Tr. at 15-19.)
The ALJ explained his reasons for finding Claimant not entirely
credible, including objective findings, Claimant's treatment, the
lack of evidence of side effects which would impact Claimant's
ability to perform work, and her abundant self-reported daily
activities. Id.

With respect to Claimant's argument that the ALJ wrongfully
discredited Claimant's credibility, the court finds that the ALJ
properly weighed Claimant's subjective complaints of pain and her
credibility in keeping with applicable regulations, case law, and
Social Security Ruling ("SSR") and that his findings are supported
by substantial evidence. 20 C.F.R. §404.1529(b)(2006; SSR 96-7p,

34

1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).   The ALJ found that Claimant's subjective complaints simply were not corroborated by the objective medical evidence of record.   The ALJ is required to evaluate a claimant's credibility, and the ALJ's evaluation is entitled to great weight. Social Security Ruling 95-5p.

<u>Evaluation of Mental Impairment</u>

Claimant next asserts that the ALJ failed to assign proper weight to the opinions of her treating psychiatrist, Dr. Ted Thornton, M.D.   (Pl.'s Br. at 12-14.)   Specifically, Claimant argues:

> [T]he ALJ simply chose to disregard the "treating physician rule" and replace it with his own "hunch" or "intuition" regarding Ms. Taylor's psychiatric fitness. The ALJ did not produce a scintilla of evidence to counter the findings of her psychiatrist and nor can he point to an inconsistent history of GAF scores.   Instead, he attempted to step into the shoes of a medical expert by reading the notes and coming to a medical conclusion that he is not qualified to make.   At a minimum, the ALJ should have summoned a medical expert to appear at the hearing to clarify questions he might have had about the GAF score compared to the treating notes he referenced in his opinion.   Under optimum circumstances, the Plaintiff should have been fairly evaluated under the guidance of Listing 12.04, with deferential consideration given to her treating physician.   Should that have occurred, the Plaintiff posits with this Court that she either meets the listing squarely, or when combined with her physical ailments, equals a listing.

(Pl.'s Br. at 13.)

The Commissioner responds that Claimant's assertion has no merit because Dr. Thornton's clinical findings, Mr. Sargent's

35

findings, and Dr. Saar's opinion support the ALJ's conclusions. (Def.'s Br. at 17-20.)  Specifically, the Commissioner argues:

> Plaintiff's one-sentence claim that she met a mental disorder listing is without merit (Pl.'s Br. at 13). Plaintiff failed to cite any factual basis for her claim. Furthermore, as the foregoing analysis reveals, the ALJ properly determined that Plaintiff's impairments did not satisfy any of the paragraph B criteria, let alone two of the four criteria necessary to meet a mental disorder listing such as Listing 12.04 (affective disorders) or 12.06 (anxiety-related disorders)(Tr. 14-15).
>
> Other than occasionally asserting that Plaintiff had a GAF of fifty, Dr. Thornton's treatment notes from 2003 to 2005 provide little insight into Plaintiff's actual condition (Tr. 279-307). [A GAF score of fifty borders on moderate, but indicates serious symptoms or serious impairments in social, occupational, or school functioning. See DSM-IV-TR at 34.] In addition to the fact that Plaintiff's treatment records and activities established that she was functioning at a higher level than a GAF of fifty would suggest, Dr. Thornton's GAF assessment was appropriately called into question by the ALJ because Dr. Thornton always assessed Plaintiff with the same GAF of fifty during her entire two years of treatment.  Furthermore, Plaintiff's GAF scores were routinely accompanied by the notation "doing well" (Tr. 279, 287, 289, 291, 293, 295, 297, 299).  Most significantly, Plaintiff's GAF scores were also inconsistent with Dr. Thornton's own mental status observations, as he repeatedly found that Plaintiff interacted well, maintained appropriate eye contact, had appropriate affect, normal thought patterns, and appropriate and informative content of thought (Tr. 280, 282, 284, 286, 288, 290, 292, 294, 296, 298, 300, 302, 304).  Lastly, Plaintiff's mental impairments were apparently minimal enough for her to discontinue treatment in 2005...
>
> The ALJ's finding that Plaintiff did not have a disabling mental impairment was fully supported by the findings of the consultative examiner and state agency reviewing physician.  The licensed psychologist, Lester Sargent, MA...[u]nlike the conclusory, unsupported opinion of Dr. Thornton, the consultative examiner's findings were well-documented and consistent with Plaintiff's stated

activities of daily living.

Finally, the ALJ also properly accorded weight to the opinion of the state agency reviewing consultant, Dr. Saar (Tr. 19, 316-29)...Dr. Saar found that Plaintiff related well, and opined that "the evidence does not support severe limitations" in functional capacity (Tr. 328). Although Dr. Saar found that Plaintiff's mental impairment was not severe, the ALJ generously gave Plaintiff the benefit of the doubt in finding that Plaintiff's mental impairment was severe for purposes of his decision (Tr. 19). In short, substantial evidence supports the ALJ's determination that Plaintiff did not suffer from a disabling mental impairment.

(Def.'s Br. at 18-19.)

When evaluating a claimant's mental impairments, the Social Security Administration uses a special sequential analysis outlined at 20 C.F.R. §§ 404.1520a and 416.920a. First, symptoms, signs, and laboratory findings are evaluated to determine whether a claimant has a medically determinable mental impairment. §§ 404.1520a(b)(1) and 416.920a(b)(1)(2010). Second, if the ALJ determines that an impairment(s) exists, the ALJ must specify in his/her decision the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s). §§ 404.1520a(b)(1) and (e), 416.920a(b)(1) and (e)(2010). Third, the ALJ then must rate the degree of functional limitation resulting from the impairment(s). §§ 404.1520a(b)(2) and 416.920a(b)(2)(2010). Functional limitation is rated with respect to four broad areas (activities of daily living, social functioning, concentration, persistence or pace, and episodes of decompensation). §§ 404.1520a(c)(3) and 416.920a(c)(3) (2010). The first three areas

are rated on a five-point scale: None, mild, moderate, marked, and extreme. The fourth area is rated on a four-point scale: None, one or two, three, four or more. §§ 404.1520a(c)(4) and 416.920a(c)(4) (2010). A rating of "none" or "mild" in the first three areas, and a rating of "none" in the fourth area will generally lead to a conclusion that the mental impairment is not "severe," unless the evidence indicates otherwise. §§ 404.1520a(d)(1) and 416.920a(d)(1) (2010). Fourth, if a mental impairment is "severe," the ALJ will determine if it meets or is equivalent in severity to a mental disorder listed in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2010). Fifth, if a mental impairment is "severe" but does not meet the criteria in the Listings, the ALJ will assess the claimant's residual functional capacity. §§ 404.1520a(d)(3) and 416.920a(d)(3) (2010). The ALJ incorporates the findings derived from the analysis in the ALJ's decision:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

§§ 404.1520a(e)(2) and 416.920a(e)(2) (2010).

As previously addressed, the ALJ found that Claimant suffered from the severe mental impairments of depression and anxiety. (Tr. at 13-14.) In making this finding, the ALJ stated:

38

With regard to the claimant's mental impairment, a comprehensive psychiatric evaluation was performed on January 14, 2003, by Ted Thornton. The claimant presented complaints of nervousness and anxiety. She was tearful and quite depressed during the interview. She was diagnosed with major depression, recurrent; features of generalized anxiety disorder; and features of panic disorder. She had a global assessment of functioning score of about 50 (Exhibit 2F/28). On June 14, 2005, the claimant was diagnosed with major depressive disorder and generalized anxiety disorder (Exhibit 2F/1).

The claimant underwent a consultative psychological evaluation on August 3, 2006, by Lester Sargent, M.A. The claimant was cooperative throughout the evaluation. Her recent memory was severely deficient. The claimant's concentration was mildly deficient. The claimant was diagnosed with anxiety disorder, not otherwise specified (mixed anxiety-depression disorder) (Exhibit 4F)...

(Tr. at 14.)

When the claimant was examined by Dr. Ted Thornton on June 14, 2005, he noted that she was doing well and her mood was better. She had improved on her medication. The claimant's global assessment of functioning score was 50 (Exhibit 2F/11). Dr. Thornton noted that the claimant interacted well; had direct eye contact; her mood was euthymic; and her stream of thought was normal. On June 3, 2003, Dr. Thornton noted that the claimant was doing better; sleeping seven hours; and her mood was better (Exhibit 2F/23).

During the examination by Mr. Sargent, the claimant's affect was mildly restricted. The claimant's mood was remarkable for mild sadness and anxiety. Her thought processes were understandable and connected. Her judgment was within normal limits and her insight was fair. There was no evidence of psychomotor agitation or retardation, other than mild restlessness. Her immediate memory and remote memory were within normal limits. Her persistence and pace were within normal limits. Her social functioning during the evaluation was within normal limits (Exhibit 4F)...

The claimant's lack of credibility as to her physical complaints raises a significant question as to her allegations of significant psychological symptoms and

> limitations.   In addition, the treatment notes of Dr.
> Thornton do not support the claimant's testimony.   While
> Dr. Thornton assessed the claimant with a GAF of 50, the
> balance of her treatment records indicate that the
> claimant was functioning at a higher level.

(Tr. at 18.)

After determining at the fourth step that Claimant's mental

impairment was "severe," the ALJ then determined that Claimant's

depression and anxiety did not meet or equal in severity a mental

disorder listed in Appendix 1. §§ 404.1520a(d)(2) and

416.920a(d)(2) (2010).   Then, at the Fifth step, the ALJ assessed

the claimant's residual functional capacity.   §§ 404.1520a(d)(3)

and 416.920a(d)(3) (2010).

> With regard to side effects of medications, the
> undersigned finds that the claimant suffers from no side
> effects from any medications which would interfere with
> performing the jobs identified by the vocational expert.

> With regard to activities of daily living, the claimant
> minimized her level of activity.   The undersigned notes
> in the medical records that there is no basis for such
> restricted activities of daily living.

> As to the effectiveness of treatment, the claimant has
> received treatment for the allegedly disabling
> impairments, but the treatment has been essentially
> routine and/or conservative in nature.   Further, it the
> claimant were suffering to the extent alleged it would be
> expected that intensification of treatment would occur.
> However, the claimant has continued on with conservative
> treatment.

> As for the opinion evidence, on August 14, 2006, Timothy
> Saar, Ph.D., a state agency medical consultant, completed
> a Psychiatric Review Technique form and opined that the
> claimant did not have a severe impairment (Exhibit 5F).
> The undersigned gives some weight to this opinion; but,
> gives the benefit of doubt to the claimant and finds her
> mental impairment is severe.

On September 5, A. Rafael Gomez, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment and concluded that the claimant could perform a restricted range of medium exertional work (Exhibit 7F). As this assessment is well supported by the medical record, it is given significant weight.

On December 9, 2006, James Egnor, M.D., a state agency medical consultant, completed a Physical Residual Functional Capacity Assessment and concluded that the claimant could perform a restricted range of medium exertional work (Exhibit 10F). As this assessment also is well supported by the medical record, it is given significant weight.

On December 14, 2006, Debra Lilly, Ph.D., a state agency medical consultant, completed a Psychiatric Review Technique form and opined that the claimant does not have a severe mental impairment (Exhibit 11F). This assessment is given no weight as it is not supported by the medical record...

(Tr. at 18-19.)

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be 202.17. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as small parts assembler...and price marker...Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, and residual functional capacity, the claimant has been capable of making a successful adjustment to other work that exists in significant

41

numbers in the national economy.  A finding of "not
disabled" is therefore appropriate under the framework of
the above-cited rule.

(Tr. at 19.)

Clearly the ALJ did not "disregard the "treating physician
rule" and replace it with his own "hunch" or "intuition" regarding
Ms. Taylor's psychiatric fitness" as alleged by Claimant. (Pl.'s
Br. at 13.)   The ALJ thoroughly discussed Dr. Thornton's reports
and found that Claimant had the severe mental impairments of
depression and anxiety.  (Tr. at 13-14.)  He then evaluated all the
evidence of record and determined that Claimant's depression and
anxiety did not meet or equal in severity a mental disorder listed
in Appendix 1. §§ 404.1520a(d)(2) and 416.920a(d)(2) (2010).  (Tr.
at 14-15.)  Then, through a series of hypothetical questions to the
Vocational Expert with participation by Claimant's representative,
the ALJ assessed the claimant's residual functional capacity and
eventually reached the conclusion that Claimant could make a
successful adjustment to other work that exists in significant
numbers in the national economy.   §§ 404.1520a(d)(3) and
416.920a(d)(3) (2010). (Tr. at 20, 36-43.)

Additionally, the undersigned finds no merit in Claimant's
assertion that the ALJ should have had a medical expert testify at
the administrative hearing "to clarify questions he might have had
about the GAF score compared to the treating notes he referenced in
his opinion" (Pl.'s Br. at 13.)  Clearly, the ALJ did not have any

42

questions regarding the GAF score as he found: "While Dr. Thornton assessed the claimant with a GAF of 50, the balance of her treatment records indicate that the claimant was functioning at a higher level." (Tr. at 18.)

Regarding the ALJ's duty to refer a claimant for a consultative examination, 20 C.F.R. § 416.917 (2010) provides that

> [i]f your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.

It is Claimant's responsibility to prove to the Commissioner that he or she is disabled. 20 C.F.R. § 416.912(a) (2010). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment. Id. § 416.912(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

The undersigned finds that the ALJ properly evaluated the claim and was not delinquent in any duty to refer a claimant for a consultative examination per 20 C.F.R. § 416.917 (2010) or to have had a medical expert testify at the administrative hearing. It is noted that the regulation provides that an ALJ "may" ask for a physical or mental examination if there is not sufficient medical evidence about the impairment to determine whether a disability exists. Here, the ALJ held the record open following the first administrative hearing for the claimant to undergo a consultative physical examination. (Tr. at 10, 74.) Additionally, the ALJ found the claimant had a severe mental impairment despite two State agency medical consultants, Drs. Saar and Lilly, determining that Claimant did not have a severe mental impairment. (Tr. at 13-14, 19, 316-29, 421-34.) It is clear from the decision that the ALJ

44

considered the entire record, including Claimant's testimony regarding her medical treatment, medications, and activities of daily living. (Tr. at 10-21.)  Substantial evidence supports the ALJ's determination that Claimant did not suffer from a disabling mental impairment.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit this Order to all counsel of record.

ENTER: September 22, 2011

Mary E. Stanley
United States Magistrate Judge

45